2017 AUG 22 PM 2: 59

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Augusta Division

IN RE:                                  Miscellaneous
                                        Proceeding No. <u>16-00101</u>
TODD M. BOUDREAUX
                                        <u>**UNDER SEAL**</u>

---

### <u>REPORT AND RECOMMENDATION</u>

Before the Court is the sealed attorney disciplinary proceeding involving Mr. Todd M. Boudreaux, Esq. ("Boudreaux "), Georgia Bar No. 070023. The proceeding was held pursuant to Southern District of Georgia Local Rule 83.5. The matter was commenced pursuant to an order for Boudreaux to appear and show

---

S.D. Ga. L.R. 83.S(f) and (g) states in pertinent part:

(f) Any disciplinary proceedings under this Rule shall be closed except that the Court may, in its discretion, open to the public any such proceeding when justice so requires or when the subject of any disciplinary action so requests.

(g) Where in a matter pending before an Article I Judge it appears that any attorney appearing in a case or proceeding or representing a party in interest in such case or proceeding, has violated any of the [Georgia Rules of Professional Conduct or ABA Model Rules of Professional Conduct], the Article I Judge may initiate a proceeding . . . , may terminate the proceeding at any stage when the question raised is unsupported or unsubstantiated , and if the proceeding is not terminated , shall at the conclusion of the proceeding submit to the Chief Judge of this Court, proposed findings of fact and, where appropriate, a recommendation for the discipline of the offending member.

cause why this Court should not enter a Report and Recommendation to the District Court of the Southern District of Georgia recommending his suspension, disbarment, the imposition of sanctions and other disciplinary actions in connection with his conduct before this Court. Dckt. No. 1. The show cause order was issued after concerns arose before this Court and after the United States Trustee ("UST") filed a motion for sanctions detailing very serious allegations involving Boudreaux's conduct in the case of In re Mohr, Chapter 7 Case No. 13-11606 (Bankr. S.D. Ga. August 30, 2013). Dckt. No. 13-11. Thereafter, a supplemental show cause order was issued by this Court to include allegations that Boudreaux improperly affixed the signatures of several purported petitioning creditors in an effort to place a com any involuntarily into bankruptcy. Dckt. No. 6. Boudreaux retained counsel and filed responses stipulating to many of the allegations, but stating there are mitigating circumstances for the Court to consider. Dckt. Nos. 2, 5, 7, 9-UST-1. A hearing was held April 14, 2017.

In summary, the allegations fall into the following five categories:

> 1. Improperly receiving and holding funds belonging to the In re Mohr chapter 7 bankruptcy estate.

In the In re Mohr case, Boudreaux knew by late July 2016 there was an agreement to sell an apartment complex and he knew his client,

the debtor,   stood to receive a significant distribution.   These funds belonged to the client's bankruptcy estate, not Boudreaux's client.   Boudreaux received the funds on Tuesday,   September 20, 2016.  Prior to the sale, he did not inform the trustee of the sale, and  he did not direct  the funds be delivered  to  the  bankruptcy estate.  Ultimately, he did remit these funds to the  bankruptcy estate, but he did not promptly deliver the funds, and he lied and lacked candor about the transaction.

2. Lying about his receipt of these funds and the activities related to these transactions.

Boudreaux lied about his receipt of these funds and the activities related to the transaction. On Tuesday, September 27, 2016, after Boudreaux's receipt of the funds, the Court, without knowledge of the sale of the apartment complex, held a hearing on the trustee's motion to sell the debtor's interest in the limited liability company that had owned the apartment complex.  Neither Boudreaux nor his client appeared at the hearing, or disclosed the fact that the apartment complex had been sold on September 19th and Boudreaux held debtor's distribution from the proceeds. At the hearing, when it became apparent that the sale had occurred and a substantial sum of money had been disbursed, the Court denied the motion to sell and subsequently held a turnover hearing on October 6, 2016 in an effort to locate and obtain the funds.  At this turnover hearing, Boudreaux

3

lied about the date he received the funds and his knowledge of the sale of the apartment complex and the transactions related thereto.

> 3. Without authority, affixing the electronic signatures of five purported petitioning creditors on an involuntary bankruptcy petition.

Without proper authority, Boudreaux affixed the electronic signatures of five purported petitioning creditors on an involuntary bankruptcy petition. There are few stronger provisions of the Bankruptcy Code than to involuntarily force a company into bankruptcy. See generally 11 U.S.C. §303. As a safeguard, the Bankruptcy Code sets forth numerosity and claim status criteria that must be met for petitioning creditors to involuntarily place an entity into bankruptcy. See 11 U.S.C. §303(b). Without these unauthorized signatures, it is highly unlikely the remaining petitioning creditors met the statutory requirements to pursue the involuntary. Boudreaux also did not promptly acknowledge or correct these defects as he continued to pursue the involuntary petition.

> 4. Making false and misleading statements of material matters in Court and pleadings.

Recently, Boudreaux has made numerous false and misleading statements of material matters in Court and in pleadings. On numerous occasions, he has failed to fully cite statutes, relevant authority, and failed to fulfill his duty of candor. He also has filed bankruptcy schedules without proper authority from his client.

4

He failed to fully cite pertinent authority in the In re Mohr case, leaving out the pertinent language of "in a trust" in dealing with the 11 U.S.C. §541(c)(2). Furthermore, as stipulated, in the In re Mohr case, Boudreaux filed numerous schedules on behalf of his client under penalty of perjury without obtaining the client's required signature and approval. See e.g. In re Mohr, Chapter 7 Case No. 13-11606, Dckt. Nos. 402, 536 (the Declaration purported electronically signed by the debtor declares under penalty of perjury that debtor has read the schedules and they are true and correct); See Fed. R. Bankr. P. 1008 ("All petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. §1746."); 9 Collier on Bankruptcy§ 1002.02[8](16th ed. 2015)("With the advent of electronic filing of bankruptcy petitions, among the facts that the attorney is certifying by filing a petition that indicates the debtor has signed it is that the debtor has, in fact, signed a paper copy of the petition."); Bankr. S.D. Ga. ECF R. 7 ("Documents that are electronically filed and require an original signature, other than that of the filer, should be maintained in paper form by the filer for at least five (5) years after the conclusion of all appeals or the expiration of time for filing a timely appeal, whichever is later.")

In the In re McFarland, Chap. 7 Case No. 11-10218,

5

Boudreaux challenged the validity of electronic signatures on a consent order without citing the full local rule which nullified his argument. At the hearing, the Court had to prompt him twice to read further in the rule to include the relevant provisions which were adverse to his argument. <u>Id.</u> Dckt. No. 383, pp. 7-8. He also has stipulated to asserting baseless arguments, contradicted by the record: in the <u>In re McFarland</u> case dealing with inaccurate jurisdictional arguments he raised; in the <u>In re Brooks,</u> Chap. 7 Case No. 13-10860 inaccurate arguments he asserted dealing with attachments of guaranties and an entity's qualification to do business within the State of Georgia.

> 5. Conducting himself unprofessionally in his interactions with clients, colleagues and the Court.

Boudreaux has conducted himself unprofessionally in his interactions with clients, colleagues and the Court. Obviously, the conduct referenced above is unprofessional. In addition, Boudreaux has conducted himself unprofessionally. He acknowledges he has sent unnecessary vitriolic emails and conducted himself boorishly unprofessional in Court and with his colleagues.

**<u>Summary Recommendation.</u>**

Standing alone, each one of these offenses merits disbarment. However, in certain circumstances, discipline short of disbarment is appropriate. For the reasons discussed in this Report

6

and Recommendation, after considering the undisputed seriousness of these violations along with the specific facts and circumstances of this case, this Court respectfully makes the following disciplinary recommendations:

> 1. Boudreaux be suspended from the practice of law before the District Court for the Southern District of Georgia for a period of one (1) year;

> 2. At the end of this one (1) year period, Boudreaux be authorized to petition to the District Court for readmission pursuant to the Court's applicable local rules. In addition, his readmission petition shall be accompanied by (i) confirmation from a board-certified psychiatrist that Boudreaux is fit to return to the practice of law; (ii) confirmation from a board-certified psychologist that Boudreaux is fit to return to the practice of law; and (iii) a certification that Boudreaux is duly licensed and in good standing with the State Bar of Georgia;

> 3. For the period of one (1) year after Boudreaux is readmitted to practice law before the District Court for the Southern District of Georgia, he shall submit monthly reports from a board-certified psychiatrist and a board-certified psychologist stating he remains mentally fit to practice law;

> 4. The final order of the District Court be referred to the State Bar of Georgia for disciplinary action; and

> 5. Within 14 days of entry of the final order, Boudreaux be required to inform the District Court whether he is admitted to practice law in any other Court or State Bar, identifying all such Courts and Bars in order for the District Court to make proper disciplinary referrals.

## STIPULATIONS OF FACT

Boudreaux stipulated to the following facts set forth in the UST's Motion for Sanctions:

A072A
(Rev. 8/82)

### The Petition and Schedules

1. On August 20, 2013, Christopher G. Mohr ("Chris Mohr") filed a chapter 11 bankruptcy case in the Southern District of Georgia, Case No. 13-11606-SDB. Chris Mohr was represented in the bankruptcy case by Todd M. Boudreaux.

2. Chris Mohr's bankruptcy case was converted to chapter 7 on August 25, 2014.

3. The original schedules listed a sixteen percent (16%) ownership interest in Spring Creek Apartments, LLC (hereinafter "Spring Creek"), which interest was valued in the original bankruptcy schedules at $0.00.

4. Spring Creek's sole asset was an apartment complex in Florida with approximately 252 units. The owners of Spring Creek included Doug Johnson, Jr., John Rocker, Brian Willis, Carson Palmer and Chris Mohr.

5. At the time Spring Creek was formed in 2008, Mr. Mohr held a sixteen percent (16%) interest in the LLC, and his interest subsequently increased and decreased between 16% and 20% as investors invested in and left the LLC. These changes are reflected in amended operating agreements. Mr. Mohr's interest increased to twenty percent (20%) at some point prior to 2013. All tax documents from 2013 forward show Chris Mohr with an ownership interest of 20%.[2]

6. The tax returns reflecting a 20% ownership interest were delivered to the U.S. Trustee's office prior to the Initial Debtor Interview and the chapter 11 meeting of

---

[2] The 2013 tax return (along with K-1) was filed on October 15, 2014. The 2014 K-1 was filed on September 16, 2015. The 2015 K-1 was filed on September 26, 2016. All documents show an ownership interest of 20%. In addition, various emails between Mr. Mohr, Mr. Boudreaux and the managing member of the LLC (Doug Johnson) show that Mr. Boudreaux was aware that Mr. Mohr's ownership interest in Spring Creek was twenty percent (20%).

[At the Show Cause hearing, the UST acknowledged Boudreaux was justified to initially list this ownership percentage at 16%. Tr. H'rg 4/14/2017, 169:1-25; 170:1-25.]

8

creditors.

7. Tax returns reflecting the 20% ownership interest were also provided to the chapter 7 trustee prior to the conclusion of the meeting of creditors when the case converted to chapter 7.

8. On October 28, 2014, after the case was converted to chapter 7, Mr. Boudreaux filed amended Schedules Band C on behalf of his client Chris Mohr, listing the same level of ownership at 16%, and reporting the value to be $1.00. Mr. Boudreaux did not obtain Chris Mohr's signature prior to filing these amendments.

9. On January 23, 2015, Mr. Boudreaux filed another set of amended Schedules Band Con behalf of his client, listing the ownership interest at 16% with a value of $1.00 (amending for other items). Mr. Boudreaux did not obtain Chris Mohr's signature prior to filing these second amendments.

## The Brian Willis Case in the Northern District of Georgia

10. On August 18, 2015, in the Northern District of Georgia bankruptcy case of Brian Willis, chapter 7 trustee Cathy Scarver filed Trustee's Motion for Authorization for Private Sale of Certain Personal Property Free and Clear of Liens and Other Interests, Including Bidding Procedures (NOGA Case 11-51759, Okt. No. 169) ("NDGA Motion to Sell").

11. Similar to Chris Mohr, debtor Brian Willis owned a percentage interest in Spring Creek.[3] Trustee Scarver sought to sell the Willis interest to a company called Partnership Liquidity Investors IV, LLC ("PLI") for $450,000.

12. The distribution list attached to the NOGA Motion to Sell shows that Chris Mohr received a copy of Trustee

---

[3] There was a dispute as to whether Brian Willis owned twenty percent (20%) or forty percent (40%) of Spring Creek Apartments, LLC. This dispute is relevant to the extent that the sales price of the Willis share was for a potential 40%, as opposed to 20%.

9

Scarver's Motion to Sell.

13. On August 28, 2015, Chris Mohr sent an email to Todd Boudreaux, copying other members of Spring Creek, stating:

> Todd, I googled this group PLI and see where they bought a bankruptcy property in '14. Do these guys just go around the country looking into cases and see what looks good? It seems a little "Fishy" that the Trustee is "all-of-a-sudden" reopening this case. If so, this can't be right. Let me know.

14. On August 28, 2015, Todd Boudreaux responded by email, saying:

> I looked them up last night and saw the same thing with a purchase in Sarasota, FL. They look like an investment fund/hedge fund/bottom feeder entity that looks for something they can try to get for a fire sale price because there is otherwise no market to buy or sell an asset of that type or in that type of situation (no bank would touch the financing for a buyer purchase a minority interest in an LLC that operates an apartment complex; that has to be an all cash deal). I am going through the docket in Brian's case to look for a few things that may give us some ammo, and will give you a call shortly.

15. Later on August 28, 2015, Todd Boudreaux sent an email to Chris Mohr and the other members of Spring Creek, describing potential objections to the NDGA Motion to Sell and noting that the owners all have 20% interests in the LLC (including Chris Mohr).

16. On September 28, 2015, Spring Creek Apartments, LLC, by and through attorney Ward Stone, filed an objection to the NDGA Motion to Sell.

17. On September 29, 2015, individual member John Rocker, by and through attorney Ward Stone, filed an objection to the NOGA Motion to Sell.

18. Chris Mohr and Todd Boudreaux actively monitored the

10

NOGA Motion to Sell and the objections filed thereto.

19. In September of 2015, there were various emails between Ward Stone and Todd Boudreaux relating to the referral of the case, LLC issues, attorney-client privilege issues, and tactics for litigation in connection with the NOGA Motion to Sell.

20. On October 27, 2015, the Bankruptcy Court for the Northern District of Georgia (Judge Sacca) held a hearing in connection with the NOGA Motion to Sell and the objections thereto. Shortly after the hearing, attorney Ward Stone sent an email to the owners of Spring Creek, including Chris Mohr, stating in relevant part:

> The hearing today was a disaster. The Court, over our strenuous objection, is going to allow an auction to proceed. The potential buyer upped its bid to $500,000 and it was suggested that the right of first refusal will allow the LLC or any Member to match that bid between now and November 18. The process will conclude with a live auction in the Bankruptcy Court on November 18, to which the Court invited the parties to "bring their checkbooks."

21. On October 28, 2015, a runner was entered on the docket in the NOGA Willis case stating "Court: Sales Auction to be held 11/18/15 at 1:00 PM in Courtroom 1404."

22. Both Chris Mohr and Todd Boudreaux were aware that the NOGA bankruptcy court ordered an auction of the Willis interest in Spring Creek.

23. On November 18, 2015, there was an auction of the Willis interest and the winning bid was $605,000. Both Chris Mohr and Todd Boudreaux became aware after the auction that it resulted in a winning bid of $605,000.

24. On November 19, 2015, Mr. Boudreaux filed another amended Schedule C to amend exemptions on assets unrelated to the LLC, leaving Chris Mohr's interest in Spring Creek

11

at sixteen percent (16%) with a value of $1.00.[4]   Mr. Boudreaux did not obtain Chris Mohr's signature prior to filing this amended Schedule C.

25. On November 22, 2015, Todd Boudreaux sent an email to Chris Mohr that contained the following language:

> After our last meeting to prepare for the depositions, I reviewed more information about your interest in the Spring Creek Apartments, LLC. Because of the way we listed this asset and exempted your interest in the LLC, we do not need to worry about the same problems with your interest that happened to Brian Willis' interest in his Atlanta case. Unlike Brian's case, I was able to fully exempt your interest in the LLC. Therefore, Steve Wallace will not be able to come after your interest in the LLC and that hedge fund company cannot force a sale of your interest in the LLC. This is significant, because it eliminates the rush to get everything else resolved, and we can let those issues play out a little more slowly, which I think is to your advantage. One way or another, we can forget about losing your interest in the LLC.

26. On November 25, 2015, the Bankruptcy Court for the Northern District of Georgia entered an Order Authorizing the Sale of the Spring Creek interest and denying the objections. The Order describes the auction, notes that Spring Creek members made multiple bids, and sets forth the final bid of $605,000 by PLI. In denying the objections, Judge Sacca held that the Bankruptcy Court had jurisdiction over debtor Willis' interest in Spring Creek and he noted that section 9.2 of the Spring Creek Operating Agreement contemplates the transfer of an interest by saying "a transferee shall merely be an assignee of the transferor Member's right to receive its share of distributions from the Company ...." The Court

---

[4] It appears that the purpose of the amendment, and the only change from the prior Schedule C, was an attempt to exempt the cash value of an insurance policy.

12

held that Spring Creek members could transfer their
economic interests without the consent of other members
and neither Florida law nor the Operating Agreement can
limit a bankruptcy trustee's right to sell the economic
interest to a third party.

27. Mr. Boudreaux was aware of Judge Sacca's order
authorizing the sale of the Willis interest in Spring
Creek to a third party.

28. Mr. Boudreaux never amended the bankruptcy schedules
to report the value of his client's 20% interest in Spring
Creek as more than $1.00.

## The Sale of the Apartment Complex

29. On March 28, 2016, Chris Mohr signed a document called
Unanimous Written Consent of the Members of Spring Creek
Apartments, LLC, which document authorized Spring Creek to
sell the entire apartment complex to RE Acquisition
Opportunity Fund, LLC for the amount of $26,250,000.00.
The Agreement for Sale was signed by the buyer and was
attached as Exhibit A to the Unanimous Written Consent.

30. On March 29, 2016, the managing member of Spring Creek
(Doug Johnson) signed the Agreement for Sale, thereby
creating a fully executed sales agreement between a
willing buyer and willing seller.

31. Chris Mohr notified Todd Boudreaux about the Agreement
for Sale of the apartment complex within a few weeks of
the signed Agreement.

32. On July 19, 2016, the members of Spring Creek,
including Chris Mohr, signed an updated Unanimous Written
Consent document. The updated version indicates that the
closing shall occur no later than August 31, 2016, and it
contains the following language:

> RESOLVED, that, upon the completion of the
> closing of the transactions contemplated by the
> Agreement For Sale and Purchase of Property with
> RE Acquisition Opportunity Fund, LLC, the Company
> shall dissolve ...

13

RESOLVED, that the pro forma accounting by Douglas Johnson, Jr., as Managing Member of the Company, attached as Exhibit B (the "Pro Forma"), is hereby acknowledged, agreed and approved as an accurate depiction of the debts, obligations, assets and distribution obligations of the Company and constitutes an acceptable financial result and plan and process of winding up and terminating the Company.

33. The Pro Forma attached to the Unanimous Consent provided estimated distributions of $551,862 to each LLC member holding 20%, including Chris Mohr.

34. Chris Mohr informed Todd Boudreaux about the updated Unanimous Consent and the fact that he (Mohr) stood to receive a significant distribution at closing.

## The Motion to Sell in the Southern District of Georgia

35. On August 18, 2016, the chapter 7 trustee in the Chris Mohr case filed an Amended Motion for Authorization for Private Sale of Certain Personal Property Free and Clear of Liens and Other Interests, Including Bidding Procedures, seeking to sell Chris Mohr's 20% interest to PLI for $275,000 ("SOGA Motion to Sell") (Dkt. No. 565).

36. On September 9, 2016, Mr. Boudreaux filed an Objection to Motion to Sell and Notice of Intent to Exercise Rights of First Refusal (hereinafter the "Objection") (Dkt. No. 572), purporting to represent not only Chris Mohr, but also managing member Doug Johnson and Spring Creek itself.

37. At the time he filed the Objection, Mr. Boudreaux. knew about the executed contract for the sale of the apartment complex and he knew that his client Chris Mohr stood to receive a large distribution if the sale closed. He knew that the estate of Chris Mohr would be entitled to those funds, yet he filed an objection purporting to exercise Doug Johnson's right of first refusal to buy the same interest from the estate for an amount less than the amount Chris Mohr stood to receive at closing. In doing so, Mr. Boudreaux knowingly advanced a position that was materially adverse to estate while simultaneously hiding the sale from the trustee and the Bankruptcy Court.

14

38. The SOGA Motion to Sell cited the Brian Willis bankruptcy case in the NOGA and it stated that the Willis interest in Spring Creek had been sold at auction for $605,000. However, the Objection filed by Mr. Boudreaux did not mention the Willis case in the Northern District of Georgia or the Order Authorizing Sale by Judge Sacca. It cited the provisions in the Operating Agreement that purport to prohibit the transfer of any interest without the written consent of all members, but it did not mention the provision that Judge Sacca considered to be important, namely section 9.2 saying "a transferee shall merely be an assignee of the transferor Member's right to receive its share of distributions from the Company " The Objection implied that there was no such provision by stating "no provision of the Operating Agreement provides for the permanent bifurcation of a member's ownership (voting) and 'economic' interest in the limited liability company for purposes of sale, transfer or otherwise." See Objection (Dkt. No, 572) at page 3.

39. The Objection did not disclose that the apartment complex was about to be sold or that Chris Mohr was about to receive a significant distribution.

40. On September 12, 2016, in connection with mediation scheduled for the following day, Mr. Boudreaux sent an email to chapter 7 trustee Steve Wallace, stating:

> In reference to the mediation tomorrow, my clients don't have much incentive to offer much more than a nuisance value settlement given the following facts:
>
> 1. 2 of the 3 transfers occurred more than 2 years pre-petition;
>
> 2. The Debtor's financial statements (that will be supported by the accountant's testimony) as well as Jack Long Sr's letter (that was written and delivered close in time to the transfers) [sic] provide ample evidence of both solvency and non-fraudulent intent, and there is no evidence at all to rebut that evidence;

15

3. Settlement of the limited issues that are to be addressed in the mediation will not address the current, largest remaining issue - - the effort to sell an "economic interest" in an LLC that runs contrary to the Operating Agreement, Florida LLC law, and Georgia LLC law.

From my conversations with the Debtor and his wife, they want everything wrapped up with this case so they can get on with their lives. I would therefore propose that we differ [sic] the mediation until we can address all of these issues. I discussed this briefly with Jim Overstreet as it related to his motion. From that conversation I understand the logistical concerns of the Trustee, especially as it would relate to the party with the current pending offer. My thought is that if we differ [sic] the mediation, I would contact the prospective buyer's attorney to explore a settlement whereby the Debtor would pay a break-up fee to resolve any interest the buyer has (rather than objecting to his right to a break-up fee as an insider and then fight over any potential sale), then mediate all of the remaining issues with the Trustee to resolve the pending adversary as well as liquidate the estate's interest in the LLC.

Although this proposal is more easily outlined than accomplished, it is worth exploring to eliminate unnecessary litigation and the "all or nothing" result attendant to that litigation. I would prefer to raise this issue today rather than in front of Judge Dalis[5] for the first time tomorrow in an effort to avoid the irritation that would be associated with his making a very short turn-around trip.

I am in the office all afternoon if we need to discuss this quickly so that we can contact the

---

[5] [Judge Dalis was serving as a mediator.]

16

Court to determine whether or not we can save
Judge Dalis the drive to Augusta.

41. Mr. Boudreaux's email to trustee Wallace did not
disclose that the apartment complex was about to be sold
or that Chris Mohr was about to receive a significant
distribution. Rather, it offered a global settlement
whereby Chris Mohr would buy his own 20% interest from the
trustee plus a "breakup fee" to the prospective buyer PLI.

42. On September 14, 2016, at 9:48 AM, Chris Mohr sent a
text message to Todd Boudreaux, stating as follows:

> Talked to Doug, everything is done and the fund
> are being mailed Monday. Can you contact Jim
> Overstreet and work something out with him? C-
> Mohr RTR.

43. By no later than September 14, 2016, Mr. Boudreaux
knew that the closing would occur the following Monday
(September 19) and he knew that his client would receive
significant funds.

44. On September 14, 2016, Ryan Isenberg (attorney for
PLI) sent an email to Todd Boudreaux, stating:

> I represent Partnership Liquidity Investors IV,
> LLC in connection with its proposed acquisition
> of your client's economic interest in Spring
> Creek Apartments, LLC. Should you have any
> questions, concerns or communications for my
> client, please forward them to my attention.

**Knowledge of Imminent Closing and Possession of the $485,000
Check**

45. On September 18, 2016, Doug Johnson communicated with
Chris Mohr to confirm that the closing on the apartment
complex would occur the next day (Monday September 19).
Chris Mohr instructed Doug Johnson to send his (Mohr's)
distribution check to Todd Boudreaux.

46. On September 18, 2016, Chris Mohr told Todd Boudreaux
that the closing would occur the next day and that he
(Boudreaux) could expect a check via overnight mail.

17

47. On Monday, September 19, 2016, the closing of the sale of the apartment complex occurred. The HUD closing statement shows that the complex sold for $26,250,000 and it shows Cash To Seller(s) in the amount of $1,981,394.30.

48. On Monday, September 19, 2016, a check for $485,000 payable to Chris Mohr was sent via overnight mail from the title company to the office of Todd Boudreaux.

49. On Tuesday, September 20, 2016, Mr. Boudreaux sent a text message to Chris Mohr, which included the statement "check for you arrived here via overnight mail".

50. On Tuesday, September 20, 2016, after receiving the check, Todd Boudreaux telephoned the office of Ryan Isenberg (attorney for PLI).

51. During the telephone call, Todd Boudreaux attempted to negotiate a deal whereby his client Chris Mohr (and/or other LLC members) would pay $275,000 plus a break-up fee to PLI in exchange for an assignment of PLI's interest in the contract to purchase the 20% interest from the Chris Mohr bankruptcy estate.

52. Mr. Boudreaux attempted to negotiate this deal while knowing that the closing had already occurred and while in possession of the $485,000 check which he knew to be property of the bankruptcy estate.

53. Mr. Isenberg contacted his client about Mr. Boudreaux's offer, but his client did not respond until later that week.

54. On Friday, September 23, 2016, at 2:59 PM, Todd Boudreaux sent an email to Mr. Isenberg, stating:

> I am out of the office this afternoon, but am checking to see whether you have spoken to your client following our last telephone conversation?

55. On Friday, September 23, 2016, at 3:18 PM, Mr. Isenberg responded by saying:

> Todd I just heard from my client this morning. I apologize for not getting back to you sooner, but

18

I am trying to get an MSJ out the door before I leave today. My client informed me that apparently the closing went through as he had received a distribution for the undisputed portion of his economic interest. I am not sure where that leave [sic] us as I can't imagine the bankruptcy court approving a sale of your client's distribution for a discount.

56. On Monday, September 26, 2016, at 9:50 AM, Jim Overstreet sent an email to Mr. Boudreaux, stating:

Todd, I know you wanted to try to work out something global with this Spring Creek thing and the other stuff you had with steve, but I understand yall were successful on the mediation as to the other matters. Where does that leave us for tomorrow? I didn't know if the settlement of those other claims made your objection go away, or if it simply made Chris's desire to keep the thing stronger - Have you talked to Jerome Fink? I didn't know if since you settled your other cases, you still wanted to work something out with them or what - Thanks. JCO

57. On Monday, September 26, 2016, at 9:57 AM, Todd Boudreaux sent an email to Mr. Isenberg, responding to Mr. Isenberg's email from Friday, stating:

I tend to agree with you final conclusion. Have you talked to the Trustee about the motion/hearing scheduled for tomorrow? I will try to find out what I can about the closing from my end.

58. On Monday, September 26, 2016, at 10:07 AM, Todd Boudreaux sent a responsive email to Mr. Overstreet, stating:

I have been talking to his attorney, Ryan Isenberg in Atlanta and sent as [sic] follow up email to Ryan about 15 minutes ago. My client remained interested in working this out with Fink because it would provide to him the opportunity to pay out the "redemption" price for their

19

residence now instead of saving up the money over
the next 12 months. The same co-owners of Spring
Creek that were going to help him finance a
settlement on the LLC interest are willing to
kick in an extra $30,000 to Chris so that he can
get this case closed, then he could pay them back
over time instead of having to pay the trustee
later. I'll let you know as soon as I hear
anything else.

59. At the time he sent these emails, Mr. Boudreaux knew
that the closing had already occurred and he had
possession of the $485,000 check.

60. On Tuesday, September 27, 2016, the morning of the
continued hearing on the SDGA Motion to Sell, Todd
Boudreaux filed a Withdrawal of Objection to Motion to
Sell. The Withdrawal did not disclose the sale/closing of
the apartment complex or that he had already received a
check for $485,000 (received seven (7) days prior).

61. On September 27, 2016, this Court held a hearing on
the SDGA Motion to Sell. Mr. Overstreet described his
knowledge of the closing of the apartment complex and
urged the Court to deny the motion based on the fact that
the LLC no longer held any property.

62. On September 27, 2016, the SDGA trustee filed a Motion
for Turnover of the $485,000 funds and Motion to Expedite
Hearing (Dkt. Nos. 584 and 585).

**Misrepresentations to the Court at the Hearing on October 6,
2016**

63. On October 6, 2016, this Court held an emergency
hearing on the Motion for Turnover. In attendance were
Todd Boudreaux, Steve Wallace (chapter 7 trustee), Jim
Overstreet (counsel for chapter 7 trustee), Ryan Isenberg
(counsel for PLI), and Matthew Mills (Assistant U.S.
Trustee).

64. When questioned about whether he knew of the closing
and when he received the check, Mr. Boudreaux gave
multiple false statements to the Court. See Transcript of
Hearing on October 6, 2016 on Expedited Motion for

20

Turnover of Property filed by Chapter Trustee.

65. Mr. Boudreaux stated in open court that he did not know about the closing and that he did not receive the check until Monday, September 26, 2016, the day before the hearing on the SOGA Motion to Sell.

66. Some of the misrepresentations were made after Mr. Isenberg described the negotiation attempted by Mr. Boudreaux following his receipt of the check on Tuesday, September 20, 2016 (page 54 forward).

67. The transcript at page 6 reflects the following exchange:

> MR. BOUDREAUX: [cont'd] ... I'm not sure what the show cause and sanctions would be because this check has never been in my client's possession ever at any time.
>
> THE COURT: Has it been in your possession? The show cause isn't just about him.
>
> MR. BOUDREAUX: No. I understand.
>
> THE COURT: Has it been in your possession?
>
> MR. BOUDREAUX: And when we did determine -- when we had it, we let the trustee know that we had it.

68. The transcript at pages 13-14 reflects the following exchange:

> THE COURT: You think that's candor? You think that -- when you know something's already been sold and you've got an as-is/where-is contract, to let that happen?
>
> MR. BOUDREAUX: Your Honor, it's not -- at that point, the motion is between the trustee and the buyer and for them to work -- work that out.
>
> At that point, I had not been able to contact my client, talk to my client. I can't simply

21

disclose information at this point.

THE COURT: You can't disclose that you have a
$400,000 check that -that the trustee is trying
to sell for 200-plus thousand, or whatever that
number was, to another party? You think that's
protected by the attorney-client privilege and
prevailing case law? So that -

MR. BOUDREAUX: But my turnover of -- of --I
understand the debtor's obligation. I understand
that these funds had to be -- be put in. But
when we're talking about the limited amount of
time that came in and -- in the context of the
case, I owe -- I owe it -

THE COURT: But you knew on the weekend. The
hearing was on Tuesday, and you didn't show up,
and you didn't tell -

MR. BOUDREAUX: No. Your Honor -

THE COURT: -- you didn't say anything.

MR. BOUDREAUX: -- actually, my -- from the e-mail
exchange, it was that Monday that we determined
that we had the check. It had been over the
weekend, but we had it on Monday. At that point

THE COURT: So Monday, you knew.

MR. BOUDREAUX: At that point, in e-mails with Mr.
Overstreet, we communicated. He knew that there
were checks that had been disbursed so there was
no -- there was nothing that I would add to the
conversation.

69. The transcript at page 16 reflects the following
statement by Mr. Boudreaux:

MR. BOUDREAUX: (cont'd) ... So given that context
that -- when I -- I did first learn of the check
on that Monday. It apparently had been in my
office that weekend, but it was Monday before I

22

knew that that check was in my office that was
payable to Mr. Mohr and that I was in possession
of it and that Mr. Mohr was not.

Given that timing, the only thing I was able to
do that I thought was in compliance with duty of
candor, duty of my client, given that timing and
given what I knew the other attorneys already
knew... this is not a surprise to anybody-· I
simply withdrew my objection to - to the sale.

70. The transcript at pages 39-40 reflects the following
exchange:

THE COURT: And no one shows up?· [referring to Mr.
Boudreaux's withdrawal of his objection and
failure to appear at the hearing on SOGA Motion
to Sell]

MR. BOUDREAUX: But they were here to do that.
There was not a danger that this would be
approved without somebody who was here telling
the Court that there had been a sale because both
the trustee and the buyer knew that.

THE COURT: And I'm sitting here preparing for a
sale, trying to  -- trying to do my work behind
the scenes when you- know -- you know that's been
going on. You've been knowing this a long time,
and you let it happen. You let it happen. It's
not an isolated instance. It's not. It's
it's·· you've got to be candid on what's going
on, and -- and I just don't't think it was there.
I don't think your -- I think your client's not
been candid. I don't think your client's been
candid.

But -- but we'll have a hearing on it to let
everybody have that opportunity on -- on that
issue. I will·have a hearing. I'll be specific
about what I know now. But it's going to be a
hearing.  If something else shows up -you can ask
for a continuance if something else shows up, but
I am not limiting the hearing when I've got this
kind of conduct going on.

23

ci.:i.A072A

(Rev. 8/82)

I -- I just -- the guy -- you say that you -- you that you didn't think it was a good settlement. He got a discharge, and he's trying to take $400,000 or $300,000. He -

MR. BOUDREAUX: I'm not sure where the inference that he's trying to take anything comes from. There was a check sent out to him from an LLC that he has no control over.

THE COURT: That he valued at a dollar. And he's never amended his schedules. And, but for the trustee finding out about it, no one would ever know.

MR. BOUDREAUX: No, because it had -- that check showed up without this motion pending. The trustee would have found out about the money. This-

THE COURT: How would that -

MR. BOUDREAUX: Had this -

THE COURT: How would that -- you're just -

MR. BOUDREAUX: -- motion not been pending.

THE COURT: Oh, so the trustee has to find out about it. "I'm going to hide it as much as I can." But the trustee, if he finds out about it, he gets it?

MR. BOUDREAUX: No, Your Honor. I - what I'm saying is I didn't know there was an imminent closing for a sale. This -- had this motion not been pending and had I not filed responsive pleadings, I would have received an overnight package with a $485,000 check for which I had no idea why.

71. The transcript at pages 44-53 reflects Mr. Isenberg's description of the negotiation attempted by Mr. Boudreaux (after Mr. Boudreaux already had the check, but before Mr.

24

Isenberg became aware that the apartment complex had been sold).

72. The transcript at pages 57-58 reflects the following exchange:

> MR. BOUDREAUX: [cont'd] ... Now, I never, at any time, knew about a scheduled closing, but I did know and obviously would know that if the estate's interest is a minority share in an LLC interest that's subject to restrictive cov- -- you know, provisions on transfer, that's worth a lot less to the estate than cash. So yes, the effort was to try to get that done before that, because once there's cash, there's no negotiations.

> But there's not any nondisclosure there. All of that was part of the conversation and the ability of us to fund any settlement with the trustee by leveraging the LLC's interest and the other members' interest in not having another strange partner with them. That was -- that was fully discussed.

> THE COURT: But you didn't know about the real estate sale at that time?

> MR. BOUDREAUX: The first I knew that there had been a closing was with Mr. Isenberg's e-mail saying, "My client's got a check, and there's no -- there's no negotiation for cash." And I'll look, but my recollection is I sent him some short reply such as, "I agree." You know, at that point, there's no more negotiations. At that point, I filed a motion -- I filed a withdrawal of my objection to the sale because, at that point, I'm assuming there's no sale going forward. There's nothing to happen except for me to try to find $485,000 that was sent somewhere on behalf of my client. And when I did, I let them know that I had that check.

73. In reality, by late July 2016, Mr. Boudreaux knew

25

there was an agreement to sell the apartment complex and knew that his client Chris Mohr stood to receive a significant distribution if the sale closed.

74. By no later than August 18, 2016, Mr. Boudreaux knew that the SDGA trustee was seeking to sell Chris Mohr's 20% interest in Spring Creek to PLI for $275,000, yet he did not disclose the impending sale of the apartment complex to the trustee or to the Court.

75. Instead, on September 9, 2016, Mr. Boudreaux filed an Objection to the SDGA Motion to Sell, making arguments that he knew had been overruled by the Bankruptcy Court in the NDGA and without mentioning the specific provision of the Operating Agreement that Judge Sacca considered to be relevant for purposes of transferring an interest in the LLC.

76. By no later than Wednesday, September 14, 2016, Mr. Boudreaux knew that the closing was scheduled to close on Monday, September 19, and that his client would receive significant funds if it closed, but did not disclose these facts to the trustee or the Bankruptcy Court.

77. By no later than Sunday, September 18, 2016, Mr. Boudreaux knew that the distribution check for Chris Mohr would be overnighted to his (Boudreaux's) office.

78. On Tuesday, September 20, Mr. Boudreaux was in possession of a check for $485,000 payable to Chris Mohr, and he knew the money was property of the bankruptcy estate, yet he did not report it to the trustee or the Bankruptcy Court.

79. Mr. Boudreaux hid the situation from the trustee, as evidenced by his emails to the trustee's attorney, and he attempted to negotiate a deal whereby his client (and other LLC members) would pay $275,000 plus a break-up fee for an interest that had already been sold and for which he was holding a check for $485,000.

80. On September 27, 2016, the morning of the hearing on the SOGA Motion to Sell, Mr. Boudreaux filed a basic withdrawal of his Objection to the SDGA Motion to  Sell

26

without disclosing that the apartment complex had already
sold and without disclosing that the money had been
disbursed and was in his possession.

81. At the hearing on the motion for turnover on October
6, 2016, when faced with express questions from the Court
about when he first knew that the closing would occur and
about when he received the check, Mr. Boudreaux provided
a series of misrepresentations and false statements.

82. According to Chris Mohr, Mr. Boudreaux instructed
Chris Mohr to not attend the hearing on October 6, 2016.

83. In addition to representing debtors in bankruptcy, Mr.
Boudreaux served as a chapter 7 trustee in the Southern
District of Georgia from October 15, 2008, until he
resigned from trusteeship effective December 16, 2016.

Tr. 04/14/2017, 92-93, Ex. UST-1, Stipulation of Facts, Dckt. No. 9.

Boudreaux also stipulated to the other facts set forth in
this Court's Sealed Show Cause Order and Supplemental Show Cause
Order as follows:

1.     In In re Mohr, Chap. 7 Case No. 13-11606, Mr.
Boudreaux failed to fully quote[6]the relevant text of 11

---

[6] Counsel cited "'[a] restriction on transfer of a beneficial
interest of the Debtor' under state law excludes that property from
the bankruptcy estate. 11 U.S.C. §541(c)(2)." Section 541(c)(2)
states in full "[a] restriction on the transfer of a beneficial
interest of the debtor in a trust that is enforceable under
applicable nonbankruptcy law is enforceable in a case under this
title." 11 U.S.C. §541(c)(2). (emphasis added to include omitted
language).

[At this Show Cause hearing, Boudreaux maintained at the time
he considered this "trust" language to be irrelevant to his
argument. This Court disagrees and continues to find this language
was relevant to the arguments being asserted in light of the
relevant case law.]

27

U.S.C. §541(c)(2), leaving out the most pertinent language "in a trust" when a key component of the legal analysis was whether the pertinent asset was in a trust. <u>See</u> Dckt. No. 351, ¶3.

2.  In <u>In re McFarland,</u> Chap. 7 Case No. 11-10218, Mr. Boudreaux argued this Court lacked jurisdiction asserting that two insurance policies were on appeal when only one policy was actually on appeal. <u>See</u> Dckt. No. 417, Order, p. 9.

3.  In the same <u>McFarland</u> case, at a hearing, Mr. Boudreaux failed to recite the key portions of the local rule on electronic signatures requiring the Court to prompt him twice to read the entire rule; including key provisions dealing with the validity of electronic signature into the record. Dckt. No. 385, pp 7-8.

4.  In <u>In re Brooks,</u> Chap. 7 Case No. 13-10860, at a hearing, Mr. Boudreaux asserted opposing counsel failed to attach pertinent guaranties. The Court stopped the hearing to have the courtroom deputy pull up the record to reveal that opposing counsel had in fact attached the guaranties to the pertinent pleading. Also in the <u>Brooks</u> case, Mr. Boudreaux asserted without any citation to the record that "RES has previously stipulated that it is not a Georgia entity and is not registered with the Georgia Secretary of State." Dckt. No. 532, p. 5. Opposing counsel responded that the statement was incorrect and noted that the statement lacked any citation to the record and attached an exhibit showing the entity was in fact registered with the Georgia Secretary of State. Dckt. Nos. 540, p. 4 and n. 1 and 541, Ex. I.

5.  Mr. Boudreaux's unauthorized affixation of electronic signatures of the purported petitioning creditors on the involuntary chapter 7 bankruptcy petition of Cedar Rock Holdings, LLC, Case No. 16-11519, when he did not have the authority to represent or affix at least three (3) of these purported creditors' signatures, and potentially five (5) (or more) of these purported creditors' signatures. <u>See</u> Involuntary Ch. 7 Case No. 16-11519 Dckt. Nos. 1, 2, 4 and 65.

28

6. Mr. Boudreaux made statements at the January 23, 2017 hearing in the involuntary chapter 7 bankruptcy petition of Cedar Rock Holdings, LLC, Case No. 16-11519, whereby he acknowledged he did not have authority to file the petition on behalf of: Stewart Construction, LLC; CSRA Testing & Engineering Co., Inc.; and W.R. Toole Engineers, LLC. Tr. H'rg 1/23/17 25:2-5. He further stated he did represent Parker Poe Adams & Bernstein PC ("Parker Poeu). H'rg 1/23/17 Tr. 15:1-25-17:1-14; 24:9-25-25:1-6. Nevertheless, in a subsequent pleading, Mr. Boudreaux acknowledged he did not have the authority to affix the electronic signature of Parker Poe to the petition, nor did he have the authority to indicate that he represented them as their attorney. Ch 7 Case No. 16-11519, Dckt. Nos. 76 and 77.

Dckt. Nos. 1 and 6.

## SHOW CAUSE HEARING

These obviously are very serious ethical violations to which Boudreaux has admitted to, and for which he has shown remorse. As noted before, standing alone each one of these offenses merits disbarment. However, in certain cases, discipline short of disbarment is appropriate. After reviewing the matter and because of the mitigating circumstances discussed below this Court respectfully recommends Boudreaux be suspended for a period of one (1) year, with his readmission subject to restrictions.

### Background.

Boudreaux has been a member of the State Bar of Georgia since the mid-1990s and has practiced primarily in the Bankruptcy Court for the Southern District of Georgia. Tr. H'rg 4/14/2017,

A072A
(Rev. 8/82)

134:1-5; 136:1-3.  After law school, he served as a law clerk of a

bankruptcy judge for almost two years.  Tr. H'rg 4/14/2017, 134:7-

14.  Later, Boudreaux was a partner in a local law firm from 2000 to

2015, recently opening his own law office.  Tr. H'rg 4/14/2017,

134:16-25.  Boudreaux holds several bankruptcy certifications and

has served as the Augusta Bar Association's Young Lawyers president

and on the board of directors and as chairman of the Bankruptcy

Section of the State Bar of Georgia.  Tr. H'rg 4/14/2017, 135:9-22.

He has been active in the local and state bar associations.  Id.

The UST selected him, and he served as a chapter 7 panel trustee

from 2008 until he resigned in 2016.  Tr. H'rg 4/14/2017, 136:6-15.

For years, Boudreaux sought treatment from his primary

care physician for mental health related issues including anxiety

and an inability to sleep. Tr. H'rg 4/14/2017, 137:2-13. As early

as 2006 Boudreaux and his primary care physician attributed these

symptoms to work related stress and his primary care physician

prescribed ████ [Drug 1], an anti-depressant, and ████ [Drug

1A], a sleep aid. Tr. H'rg 4/14/2017, 137:4-13; 138-140; 143. At

some point, Boudreaux informed his physician he did not think the

medications were duly addressing his issues, and that he was

continuing to go through extended periods without sleep and

experiencing other issues. Tr. H'rg 4/14/2017, 140:19-25;141:1. At

this point, his primary care

30

physician provided him a generic listing of potential mental health
providers, but he did not make a mental health referral. Tr. H'rg
4/14/2017, 141:2-6. Boudreaux began seeking mental health care on
his own using the referral list and his insurance company's provider
list, but without a physician referral, he was unable to get a
prompt appointment because the providers had waiting lists. Id. 6-
18.    Ultimately, Dr. Dirksen, a psychiatrist, agreed to see
Boudreaux as a favor to a friend.  Id. 19-24.   These visits are
private pay, and not covered by Boudreaux's insurance.  Id. 141:25;
142:1-2.

Finally, Boudreaux was properly diagnosed with Bipolar
Disorder I ("BP-I") by a mental health professional in December
2016, and his medication was switched from ▮▮▮▮ [Drug 1] to
▮▮▮▮▮▮ [Drug 2] and ▮▮▮▮ [Drug 3]. Tr. H'rg 4/14/2017,
139:13-25-140:1-7; 184:24-185:1-13.
According to Boudreaux, the mental health nurse practitioner
indicated ▮▮▮ [Drug 1] was contraindicated for BP-I and could
actually worsen his condition. Tr. H'rg 4/14/2017, 140:1-8.
Boudreaux's psychologist, Dr. Frey, confirms that ▮▮▮▮ [Drug 1]
actually may worsen BP- I symptoms. Tr. H'rg 4/14/2017, 46-49.

Boudreaux's first appointment with his psychiatrist, Dr.
Dirksen, was around January 15, 2017 and in February 2017 he started
his therapy with Dr. Frey. Tr. H'rg 4/14/2017, 141:13-25; 184:24-

31

25; 185:1-2; 33:24-25.  As of the hearing date, he has seen Dr. Frey

seven times.  Tr. H'rg 4/14/2017, 35:24-25; 36:1-3.

In addition to suffering from undiagnosed BP-I for some

time, Boudreaux also has experienced a number of highly stressful

family crises over the last few years. Starting in late 2011, when

his wife suddenly and unexpectedly suffered a major life-threatening

and life-altering arteriovenous malformation rupture when veins in

her brain ruptured. Tr. H'rg 4/14/2017, 144:18-25.  ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ she remained hospitalized for an

extended period of time and went through two years of extensive

therapy.  Tr.  H'rg  4/14/2017,  145:1-9.  While  she  has  made  a

remarkable recovery, she has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

the inability to identify or verbalize the names of the objects, the

inability to properly sequence or think logically through multi-step

processes and difficulty with matters involving numbers. Tr. H'rg

4/14/2017, 145-146.  ▮▮▮▮▮▮▮▮▮▮▮▮ her condition requires

Boudreaux to assist her in many daily tasks. Tr. H'rg 4/14/2017,

146;2-4; 147:2-7. During the extended acute phase of his wife's

treatment, Boudreaux remained the sole bread winner of the family

and undertook the care of his wife and their three children. Tr.

H'rg 4/14/2017, 145-47. At the time of the onset of this crisis,

their children were approximately 17, 13 and 10 years old.  Tr. H'rg

32

4/14/2017, 133:20-21. Today, Boudreaux remains responsible for many of the household duties they traditionally shared, such as the college application process, any multiple sequencing tasks and tasks requiring working with numbers. Tr. H'rg 4/14/2017, 145-47.

Then in 2015, Boudreaux, himself, was hospitalized for a week and a half with an aggressive strain of Methicillin-resistant Staphylococcus aureus bacteria (MRSA) in his finger. Tr. H'rg 4/14/2017, 148:13-19. Boudreaux underwent three surgeries and described the difficulty in running his very busy law practice from the hospital along with everything else that was transpiring in his personal life. Tr. H'rg 4/14/2017, 148:13-25.

Then in 2016, his teenage daughter was swimming with friends at a local lake and one of her friends drowned as they were trying to swim across a cove. Tr. H'rg 4/14/2017, 147:9-18. Boudreaux's daughter is a strong swimmer and tried unsuccessfully to save her friend. Tr. H'rg 4/14/2017, 147:9-25. She suffered feelings of guilt from this incident and obtained counseling at school. Id.

Some months later, this same daughter returned to the lake for the first time since the drowning and was involved in a serious accident where she was pinned and dragged under a golf cart. Tr. H'rg 4/14/2017, 148:1-7. She nearly lost her leg. Id. She was

33

hospitalized for 2 weeks and home schooled for 3 months thereafter. Tr. H'rg 4/14/2017, 148:8-11.  For an extended period of time she was homebound and required daily wound treatments.  Id.

In addition to these familial stresses, Boudreaux was dealing with his own undiagnosed BP-I, cycling through the BP-I phases without understanding or recognizing his illness.  Tr. H'rg 4/14/2017, 149-150.  He described the feelings caused by BP-I as the abject feeling of spinning out of control, an inability to nail down even routine matters, being in the eye of a tornado, and going the periods of up to 4 days without sleep.  Tr. H'rg 4/14/2017, 142:7-25; 143:1-9.  He also says the condition instills an inflated self-esteem, superman-type complex, where he saw any objection or obstacle merely as an impediment to his goal.  Tr. H'rg 4/14/2017, 156:2-14; 173:25; 174:1-4.  Initially, he self-medicated with alcohol as a sleep-aid, but ultimately decided to just stay awake and work.  Tr. H'rg 4/14/2017, 150:8-16.  At the time, he perceived his excess energy enhanced his success by allowing him to be more productive, take on more projects, while simultaneously caring for his family, and training for and competing in Ironman competitions. Tr. H'rg 4/14/2017, 143:1-9; 151:3-25; 152:1-5. Only in retrospect does he realize how self-destructive his condition was becoming. Tr. H'rg 4/14/2017, 143:1-9; 152:8-14.  In his first meeting with

34

Dr. Frey, Boudreaux questioned how he got to this position, offering "I've had a dissent into madness, and I don't know why." Tr. H'rg 4/14/2017, 54:22-25; 55:1.

He thought he had everything under control, but in the autumn of 2016, he began to realize things were spinning out of control. He was sending out vitriol emails, having issues with the UST, perceiving everything as a personal attack. Tr. H'rg 4/14/2017, 152-156. Boudreaux now acknowledges this was irrational paranoia but at the time he took every request as a personal attack. Tr. H'rg 4/14/2017, 154:10-23.

Boudreaux admits he knew he was lying to the Court at the October hearing involving his receipt of the settlement proceeds and activities related to this transaction. Tr. H'rg 4/14/2017, 159:1-10. With hindsight, proper medication and current logic he has no explanation for his conduct. Tr. H'rg 4/14/2017, 159-160. "[I]n my mind at that time, when I received the check didn't matter.....It's an absurd thought pattern, but I think that's the only one - the only thing that I could say is that it - it seemed like a - it wasn't significant." Tr. H'rg 4/14/2017, 160:8-19.

> At the time, though, it was probably one of the more severe manic phases that I had felt with both the sleeplessness, the burst of energy, with the perfect storm of lots of different issues both in the Mohr case and in other cases all kind of converging at the same time. It

35

> also coincided right there in being in
> September with my daughter's golf cart accident
> where she was in the hospital and the added
> stress and exhaustion from being at the hospital
> when I wasn't at the office to tend to that.

Tr. H'rg 4/14/2017, 159:20-25; 160:1-3.

Boudreaux's professional conduct, the quality of his work, and his staff's work, continued to be unacceptable even after the October hearing. Tr. H'rg 4/14/2017, 162-165. Thereafter, on October 26, 2016, he filed an involuntary bankruptcy petition without proper authority. Tr. H'rg 4/14/2017, 174-177; See Dckt. Nos. 14-1, 14-2, 14-3. Despite this lack of authority, he continued to pursue the involuntary until the Court ordered its dismissal in late January 2017. Dckt. Nos. 14-4, 14-5. At best, both he and his staff stopped following normal procedures designed to help safeguard professional and ethical conduct. Tr. H'rg 4/14/2017, 164-168. Boudreaux now takes full responsibility for both his and his staff's actions. Tr. H'rg 4/14/2017, 164:22-25; 165:1-5.

Since the Show Cause notice, Boudreaux has resigned as a chapter 7 panel trustee and has decreased his workload to better manage his workload. Tr. H'rg 4/14/2017, 202:6-20. He is continuing to see Dr. Dirksen, his psychiatrist, and Dr. Frey, his psychologist. Tr. H'rg 4/14/2017, 39:10-13. He wants to continue to practice before this Court in the Augusta area and he thinks the

36

local bankruptcy bar, the UST, and the Court are all well-aware of his issues and will quickly point out any reoccurrence of this type of conduct. Tr. H'rg 4/14/2017, 203:20-25; 206:24-25; 207:1-24.

Boudreaux acknowledges the seriousness of his misconduct. He has shown real remorse, not just because of this disciplinary action, but for his conduct. From his testimony, and that of Dr. Frey, it is apparent that he is struggling to understand why he has behaved in this manner and taking steps to control this illness; and to the extent possible, correct the consequences of his actions and rebuild his reputation.

As far as his long-term prognosis, Boudreaux testified he would never voluntarily go back to the way he felt before his diagnosis and treatment. Tr. H'rg 4/14/2017, 188:13-21. He states he would never unilaterally stop taking medications or going to therapy. Tr. H'rg 4/14/2017, 188:13-21; 189:1-7. Boudreaux stated:

> The last -- certainly, the last month, but maybe a little bit longer than that, is the first time that I've felt normal to just relate, to deal with things. And to try to imagine having gone 47 -- 46 and a half years the way I felt before, there's no way that I would voluntarily go back to that. If -- it's finally feeling sanity and sane and being able to manage affairs. And it's across the board professionally, personally, and everything. So I wouldn't ever try to do anything to jeopardize that.
>
> It's also because -- the inability of practicing in federal court or the state bar - - I mean,

37

it's how I provide for my family. It's the only
way that I have of -- I don't have a choice. If
I wanted to get off -- if I thought I could, I
don't have a choice but to maintain it because
there really is no alternative for me.

So both -- for my choice at that point, I would
never choose to get off the meds because,
frankly, I -- I enjoy being on them. I feel
normal. And that's not something I've felt in
a long time, so I don't see why I would ever
stop the therapies or the medications that I
needed.

Tr. H'rg 4/14/2017, 188:13-24; 189:1-7.

Boudreaux apologized for his behavior and says he never

intends to be back in this position again stating:

. . . I'm very sorry for all of it, not just
October 6th [lying in In re Mohr], but
everything else. I understand the position that
I put the Court in, the U.S. Trustee, Mr.
Cleary. You know, it's - - I'm happy that I have
the support of Mr. Cleary and Mr. Tisdale and
███████████, but I've put everyone in a very
awkward position, a bad position, and I'm very
sorry for that. And I don't -- I don't intend to
be back in this position again, and I wish that
I would have had help sooner and hopefully would
have avoided the situation. But I do apologize,
and I am sorry for that.

Tr. H'rg 4/14/2017, 190:5-13.

**Other Witnesses.**

At the show cause hearing, in addition to Boudreaux

testifying, Boudreaux's counsel called the following witnesses:

Boudreaux's psychologist, Dr. Joseph Frey III; an attorney

38

previously diagnosed with BP-I and successfully practicing with the treated illness for over 20 years, ████████████████; and Boudreaux's colleague and former law partner, Andrew Tisdale.

### Dr. Frey.

Dr. Joseph Frey III[7], Boudreaux's psychologist, testified that Boudreaux's first appointment with him was in February 2017 when Boudreaux was referred to him by a counselor. Tr. H'rg 4/14/2017, 33:24-25. As of the hearing date, Dr. Frey has had seven appointments with Boudreaux. Tr. H'rg 4/14/2017, 35:24-25; 36:1-3.

Dr. Frey detailed the nature of bipolar disorders and treatments. Id. He explained there are two forms of bi-polar disorders. BP-I which was traditionally called manic depression affecting a very small percentage of the general population and generally being more loaded with the manic side of the disease; and BP-II which is much more prevalent and generally more loaded to the depressive side of the disease. Id. at 40-42; 47:11-25. Patients with BP-I cycle through manic and depression, although depression does not have to be prominent in BP-I patients. Tr. H'rg 4/14/2017, 40-43; 90:1-8. He described the manic phase of BP-I as a euphoric

---

[7] Dr. Frey was admitted as an expert without objection. He is a licensed psychologist with over thirty years of experience and previously has been qualified in state and federal court as an expert witness. Tr. H'rg 4/14/2017, 32:17-25; 33:1-10.

,A072A
(Rev. 8/82)

state of high goals with periods of lucidity. Tr. H'rg 4/14/2017,
49:1-12; 90:15-25; 91:1-3. Some common symptoms of BP-I are
increased goal-directed activities and high energy levels that often
are channeled into self-defeating, even self-destructive behaviors
such as buying sprees, gambling, risky sexual behavior, no self-
awareness, and irritability. Tr. H'rg 4/14/2017, 43:9-14, 56:21-25;
57:1-7; 64-65; 80:1-9.

Dr. Frey testified that many mental illnesses such as BP-I
are genetically loaded making certain patients more predisposed to
suffer from the illness. Tr. H'rg 4/14/2017, 37:6-10; 43:22-23.
According to Dr. Frey, Boudreaux's diagnosis of BP-I was not
difficult. Tr. H'rg 4/14/2017, 38:23-25; 39:1-2. He testified that
Boudreaux did not suddenly become stricken with BP-I at the age of
47, rather based upon his evaluations, Boudreaux probably began
presenting symptoms of BP-I in his 20s but they were under control
and most likely evidenced through things like by staying up late and
having extra energy to study. Tr. H'rg 4/14/2017, 59:9-23; 99:11-
25. By his mid 30s his symptoms of BP-I became more evident as seen
by him becoming heavily involved with online social media, including
some pornography. Tr. H'rg 4/14/2017, 59:9-23. He was able to
self-correct this activity well before being diagnosed with BP-I.
Tr. H'rg 4/14/2017, 84:9-17. Until recently, he has been able to

'Il:.A072A
(Rev. 8/82)

channel his manic state into mainly acceptable, and even respectable, endeavors, such as taking on more work, managing his family obligations, while simultaneously training for and competing in Ironman competitions; however, without treatment, Dr. Frey says eventually a person will "hit a wall" or "fall off a cliff" when more and more demands are made on the person's time. Tr. H'rg 4/14/2017, 59:14-25; 60:1-22; 83-88. For Boudreaux, after years of successfully channeling the illness, and being a respected member of the Bar, he ultimately began to hit the wall over the last few years.

Dr. Frey says the ████ [Drug 1] initially prescribed actually may have worsen Boudreaux's condition causing him to cycle through a reduced manic state into a manic state. Tr. H'rg 4/14/2017, 47- 49:1-12. Dr. Frey says the BP-I cycling phases can last anywhere from seven days to several months. Id. at 89:18-20-90:1-8.

At the time of Boudreaux' s first visit with Dr. Frey, Boudreaux had already begun taking the medications protocoled for BP-I -- ███████████████ [Drug 2 and 3].      Tr. H'rg 4/14/2017, 50:6-13; 139:23- 25; 140:1-2. ████ [Drug 2] helps manage BP-I's symptoms, and ████ [Drug 3]is a mood stabilizer.

Tr. H'rg 4/14/2017, 46:14-16.   The   medications   and dosages are managed by Boudreaux's psychiatrist, Dr. Dirksen. Tr. H'rg 4/14/2017, 50:1-13; 84:23-25.    Dr. Frey has not discussed

41

,A072A
(Rev. 8/82)

Boudreaux's case with Dr. Dirksen, but, they work in conjunction with Dr. Frey treating Boudreaux through therapy and Dr. Dirksen treating Boudreaux pharmacologically. Tr. H'rg 4/14/2017, 31:1-4; 39:17-19.

Dr. Frey stated that the medications ▇▇▇▇▇▇▇▇▇▇▇▇ [Drug 2 and 3] are the most common medications for BP-I and may be adjusted over time to individualize the dosage for a particular patient. Tr.H'rg 4/14/2017, 46:14-16; 50:18-23; 51:1-7; 52:4-13. Boudreaux's ▇▇▇▇▇ [Drug 2] dosage recently has been doubled from 300 to 600 milligrams. Tr. H'rg 4/14/2017,50:18-23; 52:3-13. Dr. Frey explained this is common, as the psychiatrist and patient try to reach the proper dosage generally starting low and gradually increasing. Tr. H'rg 4/14/2017, 51:1-7, 52:3-13.

Dr. Frey also explained the BP-I medication does not take effect immediately. Tr. H'rg 4/14/2017, 51:15-24. He says this may explain why some of Boudreaux's misconduct continued even after he began taking the proper medications and was on notice of these show cause matters. 78:5-25; 79:1-7. Dr. Frey says it may take a year for the appropriate dosage of medication to be determined. Tr. H'rg 4/14/2017, 85:4-11.

When discussing Boudreaux's behavior outlined in the show cause orders, Dr. Frey explained while Boudreaux's illness does not

42

'l:t.A072A

(Rev.8/82)

excuse his behavior, it may help explain the conduct, including his lying. Tr. H'rg 4/14/2017, 70:15-24. Dr. Frey acknowledges lying itself is not a listed symptom for BP-I in the Diagnostic and Statistical Manual for Mental Disorders ("DSM-5"). Tr. H'rg 4/14/2017, 95:23-25; 96:1-12. However, he explained in the manic state, Boudreaux would be highly distracted, goal-driven, "flying fast", lack focus on important details, resulting in him making things up as he went along. Tr. H'rg 4/14/2017, 69:5-24; 96:20-25; 97:1-25. In a full blown manic episode, Boudreaux would see details or opposition as a mere obstacle in the way of his goal, and with the illness-driven inflated self-esteem Boudreaux would think he did not "have to answer all those little details in the courtroom." Tr. H'rg 4/14/2017, 69:5-24; 70:1-12. During the manic episodes, Boudreaux would have little to no self-awareness or ability to reflect on how his anger and belligerence was coming across to people. Tr. H'rg 4/14/2017, 57:1-7. Dr. Frey explained Boudreaux's behavior of being rude and vitriolic and interrupting people can be attributed to this inflated self-esteem common in BP-I. Tr. H'rg 4/14/2017, 70:1-25-71:1-24. Boudreaux's pressured speech and jumping from one idea to another without connecting them solidly also is consistent with the illness. Tr. H'rg 4/14/2017, 70:1-25-71:1-22.

Dr. Frey acknowledges there is a high rate of

43

noncompliance with most psychiatric medications, but he thinks Boudreaux's prognosis is good. Tr. H'rg 4/14/2017, 52:24-25; 84:14-17. Dr. Frey bases this prognosis on following: Boudreaux's BP-I is moderate, in fact Dr. Frey characterized it as "on the light side of moderate"; he has not had a full expression of the disorder; he does not have any other accompanying personality disorders; he does not have drug or alcohol abuse/dependency problems; he has not been hospitalized for the illness; he was able to self-correct his previous forays into inappropriate behaviors especially before his wife's illness; the length of time it took from onset to catastrophic event shows he can channel the illness in constructive behaviors; he has a high level of self-awareness and reflectiveness; and he values and enjoys the practice of law. Tr. H'rg 4/14/2017, 53-56; 58:9-12; 83:16-25; 84:1-17; 87:20-25; 88:1-13. All of these characteristics lead Dr. Frey to conclude that Boudreaux prognosis for duly managing the illness is good. Tr. H'rg 4/14/2017, 84:16-17; 107:1-6. However, Dr. Frey says to continue progressing, Boudreaux must continue with the medications and therapy as prescribed and recommended. Tr. H'rg 4/14/2017, 52:16-19; 84:18-22. According to Dr. Frey the ████████████████ [Drug 2 and 3] are stabilizing and can be

44

effective medications for life.[8]   Tr. H'rg 4/14/2017, 84:23-24;
112:3-16. The medications and therapy sessions will help Boudreaux
stay accountable and recognize manifestations of the illness, which
in turn will lessen his chances of being non-compliant.   Tr. H'rg
4/14/2017, 53-57; 112:17-25  The symptoms of BP-1 are easily spotted
by a professional and can be addressed if Boudreaux continues with
proper treatment. Tr. H'rg 4/14/2017, 112:17-25.

███████████.

███████████████████ a fellow attorney suffering
from BP-I also testified on behalf of Boudreaux explaining her
presentment and successful treatment and management of the illness
over the last 20 years.   ███████, like Boudreaux, was a highly
successful attorney and initially able to channel her disorder into
acceptable professional and personal endeavors. However, she
ultimately began lying to people, including her law partners, clients
and a judge. Tr. H'rg 4/14/2017, 119:1-10. She also began stealing
money from her sister and her parents and giving away large sums of
money. Tr. H'rg 4/14/2017, 121:7-10; 129:11-14. She acknowledged
that she lied to a Superior Court Judge to improperly obtain his

---

[8]   Unlike anti-depressants, such as Paxil, that may not work
after a person has taken them for awhile, the literature on ███████
███████████ [Drug 3 and 2] have not reported these issues, according
to Dr. Frey. Tr. H'rg 4/14/2017, 112:3-16.

signature on a domestic order. Tr. H'rg 4/14/2017, 119:3-5; 119:15-22. Prior to receiving treatment, she also lied to her client, law partners, family and friends.

She described the manifestations of the disease as being in the eye of a tornado, no impulse control or ability to reflect, going days without sleeping. Tr. H'rg 4/14/2017, 120-121, 124. When asked about lying to the judge, she said she knew she was lying at the time but had no impulse control with the illness, so if she wanted something done she just did it. Tr. H'rg 4/14/2017, 119:4-5; 120:5-8. "[I]f I wanted something done or to do something, I just did it without any repercussion, any thought about it. There was like no impulse control from my brain to doing whatever I was going to do." Tr. H'rg 4/14/2017, 120:3-8.

Consistent with Dr. Frey's testimony, ▮▮▮▮ stated finding the correct medication and dosage took some time, specifically for her it took from 1994 to 1996 to get the medicine regulated Tr. H'rg 4/14/2017, 120:15-25; 121:1-6; 123:6-13. ▮▮▮▮ surrendered her law license for 18 months[9] and for the first year

---

[9] The Georgia Supreme Court's final order suspending Ms. ▮▮▮▮ for 18 months was entered ▮▮▮▮▮▮▮; however the Court made the suspension retroactive to ▮▮▮▮▮▮ when the Court had granted an interim suspension. ▮▮▮▮ was reinstated on ▮▮▮▮ 1996. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

46

after she returned to practice she was required to submit a monthly report from a board-certified psychiatrist stating she was mentally fit to practice law. Tr. H'rg 4/14/2017, 130:13-24; ███████████.
███████████████████████████████.

She has successfully returned to the practice of law and been on medication without incident or complaint for more than 20 years. Tr. H'rg 4/14/2017, 123:1-17. Although she no longer requires therapy, she knows if her stress levels are elevated she must go to her doctor and have her blood levels checked. Tr. H'rg 4/14/2017, 123:10-22. Initially, these checks were quarterly and now after 20 years the checks are done yearly. Id. Over the years, various issues have arisen and she and her medical professionals have been able to manage her medications without any destructive BP-I episodes. Tr. H'rg 4/14/2017, 123:6-17.

███████ concluded:

It is horrible to have manic depression. I mean, it is horrible to be bipolar. But I promise you that there - - it's possible to do well and get better. I'm just so grateful that somebody gave me a second chance. I really am.

Tr. 04/14/2017, 125:13-17.

### Andrew Tisdale.

Mr. Tisdale is a professional colleague and personal friend of Boudreaux's. Not only are the two former law partners but

47

they have remained colleagues collaborating and referring cases to one another. Mr. Tisdale testified to the marked difference in Boudreaux's recent irrational, agitated and sometimes rude behavior compared to the calm, well-mannered and congenial Boudreaux he knew when the two were law partners and colleagues. Mr. Tisdale testified he knew something was wrong with Boudreaux lately, but he attributed it to the stresses in Boudreaux' s personal life after his wife's illness and other family crises.

### ANALYSIS AND RECOMMENDATION

This proceeding was conducted in accordance with Southern District of Georgia Local Rule 83.5 which states, "Any attorney who appears in a case or proceeding, or who represents a party in interest in a case or proceeding, may for good cause shown, and after notice and hearing, be disbarred, suspended from practice for a definite time, reprimanded, or subjected to other discipline as the Court may deem proper." S.D. Ga. L.R. 83.5(a). The local rule further states the standards of professional conduct of attorneys appearing in the Southern District of Georgia are governed by the Georgia Bar Rules of Professional Conduct and the American Bar Association's Model Rules of Professional Conduct and a violation of these rules may subject the attorney to appropriate disciplinary action. S.D. Ga. L.R.. 83.S(d).

,A072A
(Rev. 8/82)

Based upon the stipulated facts and acknowledgments, Boudreaux has stipulated to violating several of the Georgia Rules of Professional Conduct as well as American Bar Association's Model Rules of Professional Conduct. As set forth in the show cause orders these include: Georgia Rules of Professional Conduct 1.15(I) (Safekeeping Property-General), 1.2(d) (Scope of Representation and Allocation of Authority Between Client and Lawyer), 3.1 (Meritorious Claims and Contentions), 3.3 (Candor Towards the Tribunal), 3.4 (Fairness to Opposing Party and Counsel), 4.1 (Truthfulness in Statements to Others), and 8.4 (Misconduct), and ABA Model Rules 1.15 (Safekeeping Property), 3.1 (Meritorious Claims and Contentions), 3.3 (Candor Towards Tribunal), 4.1 (Truthfulness in Statements to Others), and 8.4 (Misconduct). The maximum penalty for violation of these rules, except for Rule 3.1, is disbarment.   The maximum penalty for violation of Rule 3.1 is public reprimand.

In this case, the offenses obviously are very serious and will not be tolerated - lying to the Court, improperly receiving and holding funds belonging to a bankruptcy estate, improperly attempting to use the power of the Bankruptcy Code[10] to forcefully place an entity into bankruptcy without their consent, lacking candor, and failing to fulfill the minimum standards of professionalism. Each

---

[10]   11 U.S.C. §303(b)(1).

49

of these offenses alone merits disbarment. However, in this case, there also are compelling mitigating circumstances.

It is clear Boudreaux has been seeking treatment for this problem since the early 2000s, well before the illness became unmanageable. The medicine he was initially prescribed was ineffective for BP-I and may have actually exasperated the negative aspects of the illness. This coupled with the additional stresses he has faced in his personal life are mitigating circumstances to consider in light of his illness. To be clear, none of these excuse Boudreaux's conduct, but they provide compelling mitigating factors to offer him a pathway to return to the practice of law.

Dr. Frey testified Boudreaux has shown self-reflection and remorse regarding his actions, and from Boudreaux's own testimony and demeanor, this Court thinks his remorse is sincere. He does not appear merely to be remorseful for having to face this disciplinary action, but for his actual conduct. Dr. Frey says Boudreaux is struggling to come to terms with his conduct and rectify the damage where possible and rebuild himself and his reputation. Dr. Frey thinks Boudreaux's chances for successful treatment are good because: his BP-I is on the light side of moderate; he has not had a full expression of the disorder; he does not have any other personality disorders which often hamper successful treatment; he has not been

50

hospitalized for the illness; he has shown a high level of self-awareness and reflectiveness in his therapy sessions; he was able to successfully channel the illness for a number of years; and he values and enjoys the practice of law. All of these factors according to Dr. Frey increase the likelihood that Boudreaux will be compliant with his treatment protocol and be able to successfully manage the illness. Boudreaux himself testified to his desire to remain on the medicine treatment saying this was the first time he has felt normal in 47 years. He could not imagine wanting to go back to his pre-treatment state.

Considering these matters along with the fact that up and until the last few years, Boudreaux has been a well-respected active member of the Bar for more than 20 years, and this conduct is out of character with his previous carriage before this Court and Bar, this Court respectfully recommends:

1. Boudreaux be suspended from the practice of law in the District Court for the Southern District of Georgia for a period of one (1) year.

2. At the end of this one (1) year period, Boudreaux be authorized to petition for readmission to the District Court for the Southern District of Georgia, pursuant to District Court Local Rule 83.S(h). His readmission petition shall be accompanied by (i) confirmation from a board-certified psychiatrist that Boudreaux is fit to return to the practice of law; (ii) confirmation from a board-certified psychologist that Boudreaux is fit to return to the practice of law; and (iii) a certification that Boudreaux is duly licensed and in good standing with

51

the State Bar of Georgia;

3.   For the period of one (1) year after Boudreaux is redmitted to practice law in the District Court for the Southern District of Georgia , he shall submit to the District Court a monthly report(s) from a board-certified psychiatrist and a board-certified psychologist stating he remains mentally fit; and

4.   The final order of the District Court be referred to the State Bar of Georgia for disciplinary action.


SUSAN D. BARRETT
CHIEF UNITED STATES BANKRUPTCY JUDGE

Dated at Augusta , Georgia
this 22 ᶯᵈ day of August 2017

52